565 A.2d 660

ATTORNEY GRIEVANCE COMMISSION

v.

Stuart L. ALISON.

Misc. Docket (Subtitle BV) No. 15, Sept. Term, 1988.

Court of Appeals of Maryland.

Nov. 7, 1989.

Melvin Hirshman, Bar Counsel, and John C. Broderick, Asst. Bar Counsel for the Atty. Grievance Com'n of Maryland, for petitioner.

Stuart L. Alison, Bel Air, and Lawrence P. Pinno, Jr., Joppa, for respondent.

Before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

For about two years, respondent, an attorney in Harford County, engaged in a course of professional and private conduct that was inappropriate, rude, vulgar, insulting, occasionally dangerous, and sometimes criminal. As a result, Bar Counsel filed a petition for disciplinary action, alleging not only that respondent engaged in misconduct, but also that he was incompetent, i.e., unable to render adequate legal service by reason of a mental or physical illness or infirmity. Pursuant to our direction, the charges were heard by Judge J. William Hinkel, who found by clear and convincing evidence that respondent was guilty of misconduct, but that the evidence was insufficient to show that he was incompetent. Respondent filed exceptions to the findings of misconduct. Bar Counsel filed no exceptions, and recommended a two year suspension.

Stuart L. Alison was admitted to the Bar of this State in 1978. He served as a part-time Assistant State's Attorney in Harford County for two years following his admission, and since that time he has engaged in the private practice of law in Harford County. He has not received any previous disciplinary sanction.

The conduct with which we are here concerned had its roots in marital discord. Respondent married Mary Alison in 1983. The penultimate separation in an apparently stormy relationship occurred in June of 1985. The couple reconciled in November of that year, but again separated in June, 1986. They are now divorced. We recount the relevant episodes, occurring between August 1985 and August 1987, as found by Judge Hinkel.

### 1. The Incident of August 25, 1985.

On the evening of 25 August 1985, Alison, accompanied by his 16–year–old son of an earlier marriage, followed his estranged wife, who was in a car with a man, Howard Emerick, and another woman. Alison, extremely upset because he believed Emerick was on a date with his wife,

attempted to stop the Emerick car by pulling his car in front of it. Emerick drove to the State police barrack in Bel Air with Alison following closely behind. At the barrack, an angry verbal confrontation occurred between Alison and Emerick. After the parties were separated, Alison informed a State trooper that he was thinking of "bouncing Mr. Emerick around on his head and stomping on his tongue."

The two women departed in a police car, and Emerick left in his own car. Despite advice from the State police to Alison that he should not follow Emerick, but rather "let it drop" and go home, Alison pursued Emerick. Troopers Vogt and List followed Alison, and after traveling four or five miles decided to stop him. The troopers activated emergency lights, but Alison refused to stop. After proceeding another two miles, Alison was forced to stop when Trooper List pulled ahead of him and slowed down. Alison was arrested and charged with driving while intoxicated. Because Alison resisted being handcuffed, three State troopers were required to effect the arrest. When the officers offered to transport Alison's son to his home, Alison said: "don't take anything from these mother fuckers." At the State police barrack to which Alison was then taken for processing, Alison referred to another trooper as a "mother fucker," because he perceived that the trooper was enjoying Alison's predicament.

A short time later, Alison was released, and was to be driven home by a friend and fellow attorney. However, Alison fled his friend's vehicle and proceeded on foot to his wife's home, where he banged on the door and generally caused a disturbance. The police arrived and quelled the disturbance.

Alison was subsequently convicted in the District Court of Maryland of driving under the influence of alcohol. He appealed to the Circuit Court for Harford County, was again found guilty, and was granted probation before judgment.

### 2. The "Citizen's Arrest" of August 25, 1986.

On June 25, 1986, Alison and his wife again separated. When Mrs. Alison left their home, she took much of the household furnishings and furniture, including some property belonging to Alison and his son. Although Mrs. Alison testified that the removal of property not belonging to her was inadvertent, Alison considered it a criminal act. On August 19, he filed a complaint with the Harford County Sheriff's Office alleging theft of his property. On August 25, Alison saw his wife driving in the town of Bel Air. He followed her until she stopped for a traffic signal, at which time he attempted to forcibly remove her from her vehicle. According to Alison, he was effecting a citizen's arrest in connection with what he viewed to be the felonious taking of his property.

When Mrs. Alison refused to leave her car or unlock the door, Alison secured a hammer from the trunk of his car, and broke out the window of the driver's door. He then reached in and removed the keys from the ignition, unlocked the car door, and attempted to remove his wife from the vehicle. A struggle ensued, but he was ultimately successful in wresting her hands from the steering wheel. He attempted to force her into the back seat of his car, but was stopped by other citizens and, ultimately, by the police. The police found a nine millimeter semiautomatic handgun in the trunk of his car, together with 50 rounds of hollow point ammunition. Alison was charged with malicious destruction of property, disorderly conduct, assault, battery, and unlawful possession of a handgun. Alison was released on his personal recognizance, with the condition that he have no contact with Mrs. Alison and that he refrain from harassing her. Notwithstanding this condition of release, Alison repeatedly telephoned, and occasionally confronted Mrs. Alison, demanding the return of his property. As a result, the State's Attorney for Harford County filed a motion to revoke Alison's recognizance. The motion was denied after hearing by Judge Broadnax Cameron, Jr. Judge Cameron did, however, orally instruct Alison to stay

away from his wife, and entered an injunction to that effect in the divorce case, then pending in the Circuit Court for Harford County.

Alison was ultimately acquitted of all criminal charges brought in connection with this incident.

### 3. The Baltimore City Forgery Proceedings.

Alleging that his wife had endorsed his signature on a check payable to both of them, Alison filed a charge of forgery against his wife in the District Court of Maryland for Baltimore City. On November 14, 1986, a preliminary hearing was scheduled on that charge. Assistant State's Attorney Thomas R. Kane, after reviewing documentation provided by Mrs. Alison and her attorney, met with Alison and informed him that he was dismissing the charges because he believed there was no criminal intent. Alison, unhappy with that decision, referred to Kane as an "asshole." Alison, although maintaining that there was technical merit to the charge, admitted that he filed the forgery charge to "raise the cost to her as high as he could," and that there was an element of spite in his action.

### 4. The December 1986 Harassment.

On two separate occasions in December, 1986, Alison deposited two or three plastic garbage bags full of trash on the porch of Mrs. Alison's home. Alison was thereafter charged with two counts of littering, and with harassing Mrs. Alison in violation of Maryland Code (1957, 1982 Repl. Vol., 1986 Cum.Supp.), Art. 27, § 121A. Alison, acquitted of the littering charges, was convicted of harassment.

### 5. Incident of 27 December 1986.

On December 27, 1986, Alison again went to the home of his wife, ostensibly to demand the return of his property. When she refused to admit him, he beat on the door for about a minute, removed a Christmas wreath from the door, and departed for his law office. En route he was stopped by Officer Terry Ford of the Bel Air Police Department who

informed Alison that he was being detained as a suspect in a possible domestic-related breaking and entering. He also advised Alison that he understood there was a court order directing Alison to stay away from his wife's residence. Alison, concluding that officer Ford had no authority to detain him, attempted to leave. A struggle ensued, other police arrived, and Alison was subdued and taken into custody. Alison was charged with assaulting Officer Ford, resisting arrest, and hindering a police officer. He was tried in the District Court and was convicted of all charges. On appeal to the circuit court, he was acquitted of assault and of resisting arrest, but was convicted of hindering a police officer.

## 6. Misuse of Subpoena.

On 8 May 1987, Alison was in the District Court of Maryland for Harford County for trial of the charges described in the immediately preceding incident. Alison saw that Thomas Barstow, a reporter for a local newspaper, was seated in the courtroom. Alison immediately had a subpoena issued and served upon Barstow, and at the commencement of his trial he requested the sequestration of all witnesses. Barstow was required to leave the courtroom and was not able to report on Alison's trial, as had been his expectation. Alison did not call Barstow as a witness. When asked to explain why he had caused a subpoena to be served on Barstow, Alison gave two reasons. First, he said he felt it might have been necessary to have someone familiar with the area of the arrest available to testify as to the location, and it simply did not turn out that the testimony was needed. Second, he said he intended to harass Barstow and to prevent him from reporting on the trial. Judge Hinkel found Alison had acted solely for the latter purpose.

## 7. Resistance to Court Ordered Search—Language in Court.

On 30 January 1987, Alison was scheduled to appear in the Circuit Court for Harford County to answer contempt

charges arising out of his alleged violation of the injunction against contacting or harassing Mrs. Alison. As Alison approached the courtroom, he was informed by a deputy sheriff that he would have to submit to a pat-down search of his person before being admitted. Alison refused, and attempted to force his way into the courtroom. Judge Cameron was called to the scene, and he requested that Alison submit to the search. Alison again refused, and Judge Cameron ordered the search. Alison resisted. Five deputies were required to accomplish the search. Alison was then handcuffed and carried into the courtroom.

During the course of the hearing, "Alison directed a few 'fuck you's' at John Karas, the lawyer for Mrs. Alison, and one toward Judge Cameron." Judge Cameron heard none of this.

Alison was found in contempt of court and sentenced to six months in the Harford County Detention Center. He appealed, but Judge Cameron refused to set an appeal bond. On February 10, 1987, Alison was released on bond. The finding of contempt was later reversed by the Court of Special Appeals upon a determination that the order adjudging Alison in contempt was deficient because it failed to afford respondent an opportunity to purge the contempt.

### 8. Verbal Abuse of Court Clerks.

At or about the time of Alison's last separation, Mrs. Alison's sister, Susan Medley, came into possession of some of Alison's camera equipment. Alison filed a replevin action on 31 March 1987, obtained a judgment for the return of the goods and for costs in the amount of $25.00. The attorney for Susan Medley attempted several times to pay Alison the $25.00 in costs, and informed Alison that he had the property and would turn it over to the sheriff. Alison nonetheless insisted on having the writ issued, and refused to accept the costs, contending that the judgment for costs should have been in the amount of $40.00.

On 12 June 1987, Alison went to the office of the Clerk of the District Court in Harford County, for the purpose of recording a lien of his judgment for costs, and also to attach, by way of garnishment, a bank account jointly held by Mrs. Medley and Mrs. Alison. A District Court clerk and her supervisor refused to accept the papers proffered by Alison, because a judge of the District Court had instructed the clerk not to accept any post-judgment filings in the case. Alison became verbally abusive, demanding in a loud voice that "you have to take the fucking papers." In the presence of the clerks, he referred to the attorney for Mrs. Medley as a "son of a bitch" and an "asshole," and used other profanities. He was described as very angry, red faced, and with clenched fists. As Alison left the area, he said "fuck you" to the supervisor.

### 9. Incident of 5 August 1987—Language in Court.

The final incident occurred on 5 August 1987, during a hearing before Judge H.W. Harlan, Jr. in the District Court of Maryland in Harford County. This hearing was held on Alison's petition, for return of the handgun seized during the incident of 25 August 1986. Judge Hinkel found that during the course of arguing a point of law, Alison exclaimed "bullshit" and was admonished by Judge Harlan. Alison immediately apologized. Alison denies that he directed any such comment to the court. Alison testified that the State's Attorney was making a point in argument that Alison thought was "particularly absurd," and Alison muttered "bullshit" under his breath. He admits that the trial judge heard at least part of what he said.

### Discussion

As previously noted, Judge Hinkel found that there was insufficient evidence to demonstrate that the respondent was incompetent within the meaning of Maryland Rule BV1 i. Bar Counsel has not filed any exception to this finding, and we accept it. In so doing, we hasten to add that we do not agree with Alison's contention that the charge was

prosecuted "in bad faith and without substantial justifica-
tion." Quite to the contrary, we can understand Bar Coun-
sel's concern with the pattern of abusive and sometimes
irrational dangerous conduct that persisted over a period of
two years. As Judge Hinkel noted in his findings:

> It is clear that each person who became involved in this
> dispute was viewed by Alison as an enemy and became an
> object in what appears to have been a campaign of
> disrespect, abuse and intimidation. It made no difference
> if the person were a friend, relative, newspaper reporter,
> police officer, fellow lawyer or judge. Harassment was
> the order of the day.

While it is true that a serious marital dispute has an
awesome potential to produce irrational behavior, this was
not an isolated incident. Bar Counsel's concern was solidly
grounded in fact, and it is more than a little disturbing to us
that, even at this late date, respondent has little or no
appreciation of the seriousness of his transgressions.

Concerning the allegations of misconduct, Judge Hinkel
found that respondent violated DR 1–102(A)(5) of the Code
of Professional Responsibility, and Rules 4.4 and 8.4(d) of
the Rules of Professional Conduct. Two different sets of
regulations are involved because the Disciplinary Rules of
the Code of Professional Responsibility applied to conduct
of attorneys occurring prior to January 1, 1987, and the
Rules of Professional Conduct applied thereafter. DR 1–
102(A)(5) and Rule 8.4(d) are essentially the same. Each
provides that it is professional misconduct for a lawyer to
"engage in conduct that is prejudicial to the administration
of justice." Rule 4.4 commands respect for the rights of
third persons. That rule was found to have been violated
by Alison's misuse of the subpoena to exclude the reporter,
an act about which we shall have more to say.

In addition to taking issue with certain of the facts found
by Judge Hinkel, Alison advances three principal argu-
ments: that he may not be sanctioned for speech that is
privileged by the First Amendment; that the conduct of
which complaint is made cannot properly be classified as

prejudicial to the administration of justice; and, that his conduct was "De Minimis when measured against the conduct of the various attorneys who have been disciplined by this court for violation of the Rules of Professional Conduct" and is therefore undeserving of sanction. We shall consider Alison's contentions separately.

Five of the incidents we have described involve Alison's use of profane or vulgar language. They are: incident one, when Alison referred to the State troopers as "mother fuckers," incident three, when Alison called Assistant State's Attorney Kane an "asshole" when Kane informed him that he was dismissing the forgery charges; incident seven, when Alison directed the epithet "fuck you" to attorney Karas [1] during a court proceeding; incident eight, when Alison directed abusive and profane language toward two District Court clerks; and, incident nine, when Alison voiced the comment "bullshit" during the court hearing of 5 August 1987. Judge Hinkel made specific reference to only the last three of these incidents in finding speech-related misconduct. We shall similarly restrict our consideration to those matters.

Alison raises his First Amendment argument only as to the incident involving the clerks, implicitly acknowledging that his speech as an attorney during court proceedings, if protected, may properly be restricted. Alison concedes that his conduct on this occasion was "intemperate, impolite, and

---

1. Although Judge Hinkel found that Alison also directed the epithet "fuck you" toward Judge Cameron, we sustain Alison's exception to this finding. The record of the proceedings before Judge Cameron was admitted as exhibit 39, but by stipulation of counsel pages 30–71 of the exhibit were redacted. Alison's alleged statement involving Judge Cameron occurred at page 64, in this reported exchange:

Mr. Alison: No, sir. Fuck you, Judge.
Mr. Karas: Excuse me?
Mr. Alison: Fuck you, too.

During his testimony, Alison acknowledged that the record showed he addressed the remarks to Judge Cameron, but said he did not think that was accurate because he believed he was speaking only to Karas. In the absence of evidence to the contrary, we accept Alison's recollection.

inappropriate." He argues, however, that "if the speech used by respondent is constitutionally protected he cannot be subject to disciplinary action." He is wrong.

In the first place, not all speech is protected. The Supreme Court said in *Cantwell v. Connecticut*, 310 U.S. 296, 309–10, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940), that:

> Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.

Similarly, in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), the Court said:

> Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. (footnotes omitted).

*Chaplinsky* has been given a rather narrow construction. *See City of Houston, Texas v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Lucas v. Arkansas*, 416 U.S. 919, 94 S.Ct. 1917, 40 L.Ed.2d 277 (1974); *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). *See also Diehl v. State*, 294 Md. 466, 451 A.2d 115, *cert. denied*, 460 U.S. 1098, 103

S.Ct. 1798, 76 L.Ed.2d 363 (1982); L. Tribe, *American Constitutional Law* § 12–18, at 929 n. 9.

We shall assume for the purpose of this case that Alison's words directed to the District Court clerks constitute protected speech within the meaning of the First Amendment. We hold, however, that Alison's speech and conduct on this occasion ran afoul of the reasonable, necessary, and content-neutral restrictions imposed upon attorneys by the Maryland Rules of Professional Conduct.

Upon admission to the Bar, a lawyer accepts and agrees to be bound by rules of conduct significantly more demanding than the requirements of law applicable to other members of society. As the Preamble to the Rules of Professional Conduct states:

> A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.
>
> * * * * * *
>
> A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials.

In the earlier Code of Professional Responsibility, Ethical Consideration 1–5 provided that:

> A lawyer should maintain high standards of professional conduct and should encourage fellow lawyers to do likewise. He should be temperate and dignified, and he should refrain all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.

Nearly 100 years ago, Justice Mitchell, on behalf of the Supreme Court of Pennsylvania, said:

> The bar have great liberty and high privileges in the assertion of their clients' rights as they view them, but, on the other hand, they have equal obligations as officers in the administration of justice; and no duty is more fundamental, more unremitting, or more imperative than that of respectful subordination to the court. The foundation of liberty under our system of government is respect for the law as officially pronounced. The counsel in any case may or may not be an abler or more learned lawyer than the judge, and it may tax his patience and his temper to submit to rulings which he regards as incorrect, but discipline and self-restraint are as necessary to the orderly administration of justice as they are to the effectiveness of an army.

*Scouten's Appeal,* 186 Pa. 270, 279, 40 A. 481 (1898).

Alison's conduct in directing epithets toward the opposing attorney in Judge Cameron's court (incident seven) and later in Judge Harlan's court (incident nine) is clearly inimical to the time honored standards for the conduct of attorneys. Conduct of this kind has rightfully resulted not only in disciplinary sanctions, but in attorneys being found in contempt of court. *See* annotations, *Attorney's Addressing Allegedly Insulting Remarks to Court During Course of Trial as Contempt,* 68 A.L.R.3d 273 (1976), and *Attorney's Verbal Abuse of Another Attorney as Basis for Disciplinary Action,* 87 A.L.R.3d 351 (1978).

Moreover, conduct of this kind is prejudicial to the administration of justice. That such conduct does not at the moment of its occurrence delay the proceedings or cause a miscarriage of justice in the matter being tried is not the test. Conduct of this type breeds disrespect for the courts and for the legal profession. Dignity, decorum, and respect are essential ingredients in the proper conduct of a courtroom, and therefore in the proper administration of justice. *See In Re Little,* 404 U.S. 553, 554, 92 S.Ct. 659, 660, 30 L.Ed.2d 708 (1972) (directing epithet at judge in courtroom

is "reprehensible and cannot be tolerated"); *Matter of Vincenti,* 114 N.J. 275, 554 A.2d 470, 474 (1989) (attorneys are required to act with common courtesy and civility at all times in their dealings with those concerned with the legal process). Attorneys who cannot maintain that level of professional performance must be disciplined, or if necessary, removed from the profession.

■ The State's interest in maintaining the judicial process is necessarily high. *See Cox v. Louisiana,* 379 U.S. 559, 563–64, 85 S.Ct. 476, 480–481, 13 L.Ed.2d 487 (1965). Where restrictions on the speech of those permitted to practice before this State's courts are necessary for their orderly functioning, and where regulations are content-neutral in restricting the time, place, and manner of speech, they do not violate the First Amendment's guarantee of free speech. *Hirschkop v. Snead,* 594 F.2d 356 (4th Cir. 1979). This is consistent with the position the Supreme Court has taken with respect to the restriction of speech generally.

> Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)....

*Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). *See also FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In measuring the reasonableness and the necessity of restrictions imposed upon speech in this case, we keep in mind that the restriction applies only to the disciplining of a limited class of professionals and does not yield criminal sanctions.

Alison's verbal abuse of the District Court clerks presents a problem that differs in some degree from the hurling of epithets during a judicial proceeding. This conduct did not occur in a courtroom. Attorneys are not prohibited from using profane or vulgar language at all times and under all circumstances. *In Re Williams*, 414 N.W.2d 394, 397 (Minn.1987). Rather, they are prohibited from using such language when to do so would be prejudicial to the administration of justice. We have no hesitancy in concluding that Alison's conduct in his professional dealings with the clerks was prejudicial to the administration of justice. It is not difficult to visualize the damage to the court system and to the reputation of the legal profession that would result if attorneys were free to conduct their daily business with court clerks in the manner employed by Alison. This court has not only the authority but the obligation to censure conduct of this kind by an attorney. As in the case of speech within a courtroom, the restrictions are content-neutral, reasonable, necessary, and do not contravene First Amendment rights.

Alison also complains that the prohibition against "conduct prejudicial to the administration of justice" is vague and overly broad. The same contention was made concerning a similar provision in the Disciplinary Rules promulgated by the Texas Supreme Court. In upholding the rule, the United States Court of Appeals for the Fifth Circuit said:

> The regulation at issue herein applies only to lawyers, who are professionals and have the benefit of guidance provided by case law, court rules and the 'lore of the profession.' *In Re Snyder* ... 472 U.S. [634] at 645, 105 S.Ct. [2874] at 2881 [86 L.Ed.2d 504 (1985)].

*Howell v. State Bar of Texas*, 843 F.2d 205, 208 (5th Cir.1988). We agree. The Supreme Court of Minnesota has noted that:

> Any number of cases support restraints on in-court conduct of lawyers to preserve the administration of justice. *E.g., Matter of Stanley*, 102 N.J. 244, 507 A.2d 1168

(1986) (undignified and discourteous conduct degrading to the tribunal and prejudicial to the administration of justice warranted public reprimand); *In re Vincenti,* 92 N.J. 591, 458 A.2d 1268 (1983); *Cincinnati Bar Ass'n v. Gebhart,* 69 Ohio St.2d 287, 431 N.E.2d 1031 (1982) (attorney suspended for outrageous in-court conduct as well as reprehensible behavior toward witnesses and opposing counsel out-of-court).

*In Re Williams, supra,* 414 N.W.2d at 397 n. 8. We conclude that the rule is neither facially overbroad nor void for vagueness, and it is appropriately applied in this case. *See Fellner v. Bar Ass'n,* 213 Md. 243, 247, 131 A.2d 729 (1957).

Judge Hinkel also found that Alison violated Rule 8.4(d) by refusing to submit to a pat-down search as a condition to entering Judge Cameron's courtroom, leading to an altercation involving five deputy sheriffs (incident seven). Alison argues that Judge Cameron had no authority to impose the restriction of a search upon his right to enter the courtroom, and even if the judge's action was reasonable, Alison's resistance did not amount to conduct prejudicial to the administration of justice. On the first point, Judge Hinkel found that "there were good reasons for such precaution in the mind of Judge Cameron because of the nature and history of the case, and Alison's prior possession of a weapon." We agree. Moreover, we point out that the proper procedural challenge to this order would have been by way of appeal, and not by brute force disobedience. As to Alison's second point, we conclude, for reasons previously discussed, that his conduct was clearly prejudicial to the administration of justice.

 Judge Hinkel further found that Alison violated Rule 4.4 when he misused a court subpoena for the purpose of harassing a newspaper reporter and preventing him from reporting the trial. Rule 4.4 provides:

In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass,

delay, or burden a third person, or use methods of obtaining evidence that the lawyer knows violate the legal rights of such a person.

Alison argues that Rule 4.4 cannot be applied to him in this situation, because he was not representing a client, but was representing himself. He is again wrong. The intent and purpose of Rule 4.4 is served only by the construction that a lawyer is representing a client when he represents himself, and we adopt that common sense construction. *See In Re Segall,* 117 Ill.2d 1, 109 Ill.Dec. 149, 151, 509 N.E.2d 988, 990 (1987) (an attorney who is himself a party to the litigation represents himself within the meaning of the disciplinary rules).

## CONCLUSION

■ We accept the findings of Judge Hinkel that Alison violated Rule 4.4 by his conduct in incident six, and violated Rule 8.4(d) by his conduct in incidents seven, eight, and nine. It may well be that Alison also violated DR 1–102(A)(5) by his conduct in one or more of incidents one through five,[2] but because Judge Hinkel did not specifically mention the incidents in his finding of violations, we give the benefit of the doubt to the respondent.

## SANCTION

The misconduct we have found in his case is serious. The failure of the respondent to recognize that fact is disturbing, and is a legitimate consideration in the determination of a proper sanction. Disciplinary sanctions are imposed upon attorneys for the protection of the public, and not as punishment. Consistent with that objective, however, is the notion of specific deterrence, and this case requires a significant

---

**2.** The official comment to the current rule proscribing conduct that is prejudicial to the administration of justice notes that "a pattern of repeated offenses, even ones of minor significance when considered separately, can indicate an indifference to legal obligations." *See Attorney Griev. Comm'n v. Shaffer,* 305 Md. 190, 195, 502 A.2d 502 (1986). *See also Matter of Belue,* 766 P.2d 206, 209 (Mont.1988).

suspension to impress upon this respondent that the Court will not tolerate this type of conduct. Stuart Long Alison shall be suspended from the practice of law for a period of ninety days, and thereafter until all costs are paid. This sanction shall take effect thirty days from the date this opinion is filed.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS PURSUANT TO MARYLAND RULE BV 15c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST STUART LONG ALISON.