635 A.2d 1327

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Myles R. EISENSTEIN.

Misc. (Subtitle BV) No. 25, Sept. Term, 1992.

Court of Appeals of Maryland.

Jan. 27, 1994.

466

Melvin Hirshman, Bar Counsel, and Glenn M. Grossman, Asst. Bar Counsel, for Atty. Grievance Com'n of MD, for petitioner.

Benjamin Lipsitz, Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and ROBERT M. BELL, JJ., and JOHN F. McAULIFFE,* Associate Judge of the Court of Appeals (retired).

JOHN F. McAULIFFE, Judge (Retired).

The Attorney Grievance Commission (the Commission) charges that Myles R. Eisenstein, respondent, violated a number of the Maryland Rules of Professional Conduct by the manner in which he collected fees and handled the funds of William C. Taylor (the claimant) in connection with a claim brought against ITO Corporation (ITO) under the Longshore

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

and Harbor Workers' Compensation Act (hereinafter "LHWCA" or "the Act") and by advancing certain living expenses to the claimant during the pendency of the litigation. Pursuant to Maryland Rule BV 9(b), this Court directed that the charges be heard by Judge Ellen M. Heller of the Circuit Court for Baltimore City. Respondent filed a motion to dismiss certain of the charges, contending that they were not authorized by the Review Board. That issue is preserved by respondent's exceptions, and therefore the motion is moot. Respondent also moved to dismiss the proceedings, or in the alternative for recusal of Bar Counsel, claiming violations of confidentiality and lack of objectivity. This motion is without substance, and is denied.

Judge Heller held hearings on 13 November and 3 December, 1992, and filed written findings of fact and conclusions of law. Exceptions have been filed by Bar Counsel on behalf of the Commission and by respondent.

## I.

Judge Heller made the following findings of fact: [1]

"Myles R. Eisenstein, Esquire, has been a member of the Bar of Maryland since 1957 and maintains an office for the practice of law at 110 Saint Paul Street, Suite 500, in Baltimore. The monies kept by Mr. Eisenstein, which are the subject of the charges in this case, all relate to his representation of William Curtis Taylor in claims arising under the LHWCA. Mr. Eisenstein began representing Mr. Taylor in connection with these claims shortly after an accident of November 25, 1981. However, Mr. Eisenstein had represented Mr. Taylor in other matters, and he and Mr. Taylor had what he characterized at one time as 'a close personal relationship.' In fact, although Mr. Taylor's complaint initiated these proceedings, Mr. Eisenstein continues to represent him in other matters.

---

1. Transcript references have been omitted. Footnotes to the findings of fact are those of Judge Heller, and some footnotes have been omitted.

"In regard to the claims under consideration in this matter, Mr. Taylor, because of the 1981 accident, remained out of work and received regular compensation checks until August 1, 1983, when he was convicted in federal court of the illegal possession of firearms and served a two-month sentence in the United States Penitentiary in Lexington, Kentucky. When he went to jail in August 1983, his compensation benefits ceased. He was released in October, 1983 and at that time, Mr. Eisenstein referred him back to Dr. G. Edward Reahl who did a disability evaluation. Dr. Reahl discharged Mr. Taylor but found he had a minimal permanent disability of both legs due to the accident. He also expressed an opinion that Mr. Taylor could not continue to perform unrestricted work as a longshoreman and should be rehabilitated for a different type of employment. In fall 1983, an informal conference was held by a deputy commissioner of Labor without resolution of the issues. The matter then proceeded to a formal hearing before an administrative law judge ("ALJ") in spring 1984. On December 7, 1984, an Order of Compensation was issued by the ALJ who determined that Mr. Taylor was entitled to receive $20,250.07 in benefits from the employer-self-insurer because he had sustained a 10% permanent partial disability of the left knee and a 5% permanent partial disability of the right knee.

"Mr. Taylor requested Mr. Eisenstein file an appeal from the decision of the ALJ to the Benefits Review Board. While this appeal was pending, on February 11, 1985, the ALJ approved attorneys' fees for Mr. Eisenstein in the amount of $7,456.85. This amount included expenses of $636.85. In addition, on May 16, 1985, a deputy commissioner approved an attorneys' fees award for Mr. Eisenstein in the amount of $5,000.00. Both of these fees were ordered to be paid by the employer. Payment of these fees does not have to be made until an award of compensation is deemed final which occurs when possibilities for review have been exhausted. [33] U.S.C. § 928(a) (1988); *Wells v. Intern. Great Lakes Shipping Co.,* 693 F.2d 663, 665 (7th Cir.1982). As of this date, although

these fees have been approved, they have never been paid to Mr. Eisenstein.

"In spring 1988, while the appeal was pending from the decision of the ALJ, Mr. Taylor advised Mr. Eisenstein that he had been working as a long distance truck driver for nearly two years and had been involved in another accident in June, 1987. Mr. Eisenstein stated that he told Mr. Taylor he could not represent him because, if the employer-insurer could show the availability of suitable alternative employment (being a truck driver), then the employer could avoid liability for a permanent total disability award which was the subject of the appeal. Mr. Eisenstein recommended that Mr. Taylor withdraw the appeal since he was earning an equal or greater rate of pay than that of a longshoreman. However, according to Mr. Eisenstein, he made an agreement with Mr. Taylor that if Mr. Eisenstein would continue his representation, Mr. Taylor would see to it that Mr. Eisenstein would be paid 'first' out of any future award of compensation.

"On June 27, 1988, the Benefits Review Board issued an order reversing the initial award of the ALJ and remanded the matter for a further hearing in conformity with its decision. A second hearing was held by the ALJ which resulted in a March 10, 1989 order determining that Mr. Taylor was entitled to additional temporary total disability benefits and that he was permanently totally disabled as a result of the 1981 accident and a preexisting disability. As a result, Mr. Taylor was deemed to be entitled to weekly compensation benefits for the rest of his life from August, 1983, which included cost of living increases. On June 7, 1989, Mr. Taylor received a check from the United States Treasury Special Fund in the amount of $984.00, and on June 19, 1989, he received a second check from the Special Fund in the amount of $121,897.03. On June 19, 1989, Mr. Taylor and Mr. Eisenstein deposited this latter check in Mr. Eisenstein's escrow account in the NationsBank. The placement of these monies in the escrow account is at the heart of this matter.

*Monies retained from June 19, 1989 award*

"Of the $121,897.03, Mr. Eisenstein retained $59,025.00 in his escrow account and gave the remainder to Mr. Taylor. According to a receipt signed by Mr. Eisenstein, the sum of $59,025.00 represented the following:

| | |
|---|---|
| 'Funds advanced on behalf of William C. Taylor | $ 7,225.00 |
| Harold Glaser, attorneys' fees | 1,500.00 |
| Myles R. eisenstein [sic], attorneys' fee (as of this date) | 51,800.00' |

That receipt also stated the following:

'IT IS UNDERSTOOD that if attorneys fees in this amount are not approved by the Benefits Review Board, The Deputy Commissioner, Administrative Law Judge, and the U.S. District Court, all funds due will be refunded.

'In addition, when ITO Corporation of Baltimore pays Myeles [sic] R. Eisenstein attorneys fees now pending and approved, these funds will be refunded to William C. Taylor.' "

This receipt was not signed by Mr. Taylor who testified before the Inquiry Panel that he can only read and write 'a little' and did not go beyond the third grade. Despite his limited education, however, this Court finds that Mr. Taylor did agree to Mr. Eisenstein's retention of part of the compensation award in June, 1989.

"On the receipt, $7,225.00 is entitled 'funds advanced' on behalf of Mr. Taylor, and that amount was explained as follows. Three thousand dollars were for representing Mr. Taylor in a 1983 criminal case in the U.S. District Court for Maryland; fifteen hundred were monies for representation of two uncontested divorces involving Mr. Taylor's son and daughter, as well as a custody proceeding for another daughter; and twenty-six hundred dollars were for a personal loan Mr. Eisenstein had made to Mr. Taylor. That totals $7,100.00. There remains $125.00 that Mr. Eisenstein believes was for court costs in one of the proceedings. In addition, $1,500.00 were paid to Harold Glaser, Esquire, as attorneys' fees for another matter.

"Therefore, of the $121,897.03 award received by Mr. Taylor on June 19, 1992, he took home only $62,872.03. Mr. Eisenstein retained the remainder except for the $1,500.00 fee paid to Mr. Glaser. Specifically, $51,800.00 was placed in Mr. Eisenstein's escrow account. Of this, he explains, $12,500.00 represented the attorneys' fees which had been approved in February and May 1985 but not yet paid. In addition, $11,-800.00 was an estimate of an application for a fee pending for a claim before a second ALJ, and $27,500.00 was an estimate of an application for a fee pending before the Benefits Review Board.[2] Mr. Eisenstein testified that the June 1989 receipt covered only work done for Mr. Taylor before that date.

*Events after June, 1989*

"On July 31, 1989, Mr. Eisenstein received a check from ITO in the amount of $9,775.00 for attorneys' fees. This check was endorsed by him and paid over to Mr. Taylor on the same date. Therefore, as of that date, there was remaining in the escrow account $40,025.00. Of significance, Mr. Eisenstein did not repay to Mr. Taylor the difference between the $11,800.00 he had estimated and the actual $9,775.00 awarded for representation in July 1989. Subsequently, on October 10, 1989, attorney fees were approved for Mr. Eisenstein in the amount of $9,750.00 for his work before the Benefits Review Board. Although these fees were approved, as of this date, they have still not been paid. Mr. Eisenstein did not refund to Mr. Taylor these monies or the difference between the fees that were approved—$9,750.00—and his estimate of $27,500.00 (or his request of $17,875.00).

"Therefore, as of October 1989, Mr. Eisenstein had paid Mr. Taylor only $9,775.00 of the original $51,800 kept in his escrow account. There remained in the escrow account approximately $42,025.00. Of this, $22,250.00 represented attorney fees

---

2. "Although Mr. Eisenstein testified that his estimate of the fee pending before the Benefits Review Board was $27,500.00, in fact, he had only requested a fee of $17,875.00."

that had been approved but not paid to Mr. Eisenstein.[3] This left $19,775.00 reflecting the difference between the estimates in the fee petitions and those fees actually approved.[4]

"Mr. Eisenstein's explanation for retaining these monies is that he had an independent agreement with Mr. Taylor because of their longstanding friendship and the amount of work he had done that he could keep the 'approved' fees until the employer actually paid the monies. At that time, the monies would be refunded. As far as the $19,775.00 of 'unapproved' monies, he claims that he was by that time doing additional work for Mr. Taylor and depending on the result, Mr. Taylor or the employer would be responsible for these fees. However, he did not introduce into evidence the nature of this work, the amount of work, or the number of hours. In fact, there has been no petition regarding attorney's fees filed for this money or billed to Mr. Taylor.

THE COURT: And so the bottom line question of this whole hearing is why you didn't give him the refund?

THE WITNESS: Because I am holding that money in escrow due to the additional work I did for Mr. Taylor.

THE COURT: And did you bill Mr. Taylor for this work?

THE WITNESS: No. I don't know who's going to pay it.

THE COURT: Well, what work? Where? What work?

THE WITNESS: Okay.

THE COURT: Where did you petition for extra work on his behalf?

THE WITNESS: I won't petition until the case is over. The case is still pending before the Benefits Review Board.

3. "Approximately $12,500.00 represented the fees that had been approved in February and May, 1985, and $9,750.00 represented the fee petition approved October 10, 1989."

4. "Estimate of July, 1989 $11,800.00 minus $9,775.00 = $2,025.00; October, 1989 award $27,500.00 estimate minus $9,750.00 = $17,-750.00. The total of $17,750.00 and $2,025.00 is the $19,775.00 retained in the account."

I do not know who is going to pay it until I receive a ... an award from the Benefits Review Board.

Mr. Taylor may not be required to pay one penny. But then again, he may be required to pay.

In short, because of the future possibility that Mr. Taylor may be responsible for attorney's fees concerning a matter which was only alluded to at the hearing, Mr. Eisenstein continued to keep the $19,775.00. This was notwithstanding his testimony that the June 19, 1989 receipt was only for work covered before that date. In fact, the $42,025.00 was never repaid to Mr. Taylor until April 1992—after the petition for disciplinary action was filed and after Mr. Taylor had sued him for the money. Mr. Taylor testified before the Inquiry Panel that there came a time when he asked Mr. Eisenstein for the money or for a least part of it. He stated that Mr. Eisenstein told him he didn't owe him anything. 'That's when he told me, he said he don't owe me nothing, ITO owes me. Those were his exact words.' Mr. Eisenstein admitted before this Court that keeping the monies was a mistake, but that he was very angry at Mr. Taylor. Mr. Taylor had requested the fees in 1991. Mr. Eisenstein said he told him the following at that time:

A. I told him that, 'You may well owe me a fee. You have deep personal problems at this time, and I am not going to rely upon you to pay me my fee.[']

Q. Okay. Had you, at that time when he asked for the monies back, discussed with him the fact that you were holding monies which were not approved?

A. Probably.

Q. Okay. And he said then, 'Pay them over to me.'?

A. Yeah.

* * * * * *

Q. And because you had done work for him, you maintained those fees; is that correct?

A. No. I was very angry at Mr. Taylor. Mr. Taylor became an out-and-out junkie. And he and I had a close personal relationship. I was very upset with this man.

I lost all compassion and reason for him when he became a ... a cocaine addict. You know, he really went downhill. I thought I created a monster.

"Although the $51,800.00 was initially deposited in Mr. Eisenstein's escrow account, the October 10, 1989 approved fee award was removed from the escrow account sometime in October or November, 1989, and placed in Mr. Eisenstein's personal account. That is, although these fees were approved by the October 10, 1989 order, Mr. Eisenstein did not reimburse that amount to Mr. Taylor or the difference between that amount and the original estimate. Rather, he placed the approved amount in his personal account. He testified that he kept the remainder of the original estimate in his escrow account at that time because, 'There is no question, I owed it to the claimant.' Nevertheless, when the $42,025.00 was finally paid to Mr. Taylor in 1992, it was paid from Mr. Eisenstein's personal account. According to his testimony, he was advised by his accountant to pay income tax on the entire $51,800.00 he had placed in escrow. After April, 1990, he maintained only about $11,000.00 of Mr. Taylor's funds in the escrow account.

"In sum, Mr. Taylor received an award on June 19, 1989 of $121,897.03. Fifty-nine thousand twenty-five dollars was given to Mr. Eisenstein. Fifty-one thousand eight hundred dollars was placed in his escrow account, comprising approved and unapproved petitions for attorney fees for claims under the LHWC. Of this, Mr. Taylor received only $9,775.00 in July, 1989. He did not receive the remaining $42,025.00 until after a grievance had been filed with the Commission, although it is also true that Mr. Eisenstein has never received awards for the attorney fee petitions that were approved."

## II.

Judge Heller found that respondent had violated the following Rules: Rule 1.8(e) (providing financial assistance to client); Rule 1.15(a) (maintaining separate accounts for client's property); Rule 8.4(c) (engaging in conduct involving dishonesty,

fraud, deceit, or misrepresentation); and Rule 8.4(d) (engaging in conduct that is prejudicial to the administration of justice). The hearing judge found no violations of Rule 1.5(a) (charging unreasonable fee) or Rule 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects).

Bar Counsel filed exceptions to the findings that respondent had not violated Rules 1.5(a) and 8.4(b). Respondent filed exceptions to certain of Judge Heller's findings of fact, and to the findings that respondent had violated Rules 1.15(a), 1.8(e), and 8.4(c) and (d). Our review of the record, affording appropriate deference to those findings of the hearing judge that are not clearly erroneous, leads us to conclude that certain of the exceptions of each party must be granted, but that clear and convincing evidence supports the finding that respondent committed violations of the Rules warranting the imposition of a sanction.

### III.

The Longshore and Harbor Workers' Compensation Act is a workers' compensation plan requiring employers to compensate their employees for certain job-related injuries or deaths. 33 U.S.C. § 904 *et seq.* Claims are filed with the Deputy Commissioner, and then, if necessary, referred to an Administrative Law Judge (ALJ) for a hearing, and to the Benefits Review Board (the Board) for appellate review. Further appellate review is available in federal courts.

The Act establishes a comprehensive regulatory scheme of attorney's fees, providing that where the employer[5] denies liability, and the claimant thereafter obtains a compensation award, the employer is liable for the fees. 33 U.S.C. § 928(a). Similarly, if the claimant prevails where there is a controversy concerning the amount of compensation to be

---

5. All of the provisions of the Act discussed herein are applicable to insurance carriers as well as employers. We refer only to the employer here for reasons of brevity, and because the employer in this case was self-insured.

paid, the employer may be required to pay attorney's fees reasonably representing efforts expended by the attorney with respect to the amount in controversy. *Id.* Attorney's fees assessed against the employer are in addition to the award of compensation and are paid directly by the employer to the attorney, but not until the compensation award becomes final. *See Thompson v. Potashnick Constr. Co.*, 812 F.2d 574 (9th Cir.1987); *Wells v. International Great Lakes Shipping Co.*, 693 F.2d 663, 665 (7th Cir.1982). No attorney's fees may be assessed against the employer if the claim is denied, or if the compensation award is equal to or less than any settlement offer originally made by the employer. 33 U.S.C. § 928(b); 20 C.F.R. § 702.134(b). Attorney's fees for services rendered to the claimant in connection with the claim but not assessable against the employer may be awarded, and may be made a lien upon the compensation due under an award. 33 U.S.C. § 928(c).

In all cases, fees for attorneys representing claimants under the Act must be approved by the Deputy Commissioner, the ALJ, the Board or a court. Anyone who receives an unapproved fee in connection with representation of a claimant is subject to a fine of $1,000 or imprisonment for not more than one year, or both. 33 U.S.C. § 928(e). Contracts between attorney and claimant regarding the amount of a fee are invalid. 20 C.F.R. § 702.132 (1992).

The fee provisions of the Act, designed to afford a full measure of protection to the claimant, may result in delay in the attorney receiving the fee. Compensation must be paid to the claimant when an award is entered even though an appeal is taken, but attorney's fees payable by an employer are not required to be paid until the appeals process is completed. If the employer is successful on appeal, the employer's liability for attorney's fees will be reduced or abated, depending on the extent of the employer's success, in which case the attorney may seek approval of a fee to be paid by the claimant. If, however, the compensation benefits to which the claimant is entitled according to the award that results from the appeals

process have already been paid to the claimant, there may be no fund from which the fees could be paid.

Respondent contends that having achieved a very favorable result for the claimant in his appearance before the ALJ, which resulted in significant lump sum payments to the claimant for accrued compensation, and faced with a possibility of reversal on appeal because of the claimant's acknowledged return to gainful employment, he sought the establishment of an escrow fund that would assure the payment of fees approved for work done to that date. Respondent points to the receipt he gave to the claimant at the time he received the $51,800, arguing that the written terms of his receipt did no more than establish an agreed escrow account for funds believed to represent the aggregate amount of fees approved for work done to that date, and to ensure that funds would be available for the payment of those fees if and when the approval became final. Thus, respondent says, if the claimant had prevailed on appeal and the employer had been required to pay the previously approved fees, respondent would have paid to claimant the amounts of those fees as and when respondent received them from the employer. Following this course of action, respondent says, he would not have taken or received a fee until the approval was final and the fee actually received, and consequently he would not have violated the Act. Had the claimant not prevailed on appeal, and if the appropriate authority had ordered payment by the claimant of fees for work previously done, the escrow fund could have been used for payment of the approved amount, and the attorney still would not have received or taken a fee that had not been finally approved.

 Respondent's theory concerning the establishment of an escrow account that would not violate either the Act or the Rules of Professional Conduct is interesting, albeit suspect in some respects. First, an attorney bears a significant burden to prove the fairness of an agreement concerning fees made with his client after services have been rendered in the course of the confidential relationship of attorney and client.

When attorney and client contract during that relationship 'the law makes a presumption against the attorney and in favor of the client. In such case the *onus* is on the attorney to prove the entire *bona fides* and fairness of the transaction. . . .' *Merryman v. Euler,* 59 Md. 588–90 (1883). *Attorney Griev. Comm'n v. Korotki,* 318 Md. 646, 666, 569 A.2d 1224 (1990). *See also Keyworth v. Israelson,* 240 Md. 289, 302–304, 214 A.2d 168 (1965); *Tucker v. Dudley,* 223 Md. 467, 473, 164 A.2d 891 (1960); *Etzel v. Duncan,* 112 Md. 346, 350–51, 76 A. 493 (1910). Second, we note that the agreement deprives the client of the use of his money for a period of time not contemplated by the Act, without provision for interest.

On the other hand, a knowledgeable claimant, having a desire to obtain the services of competent counsel and to secure a fund for just payment of final and approved fees, might well be disposed to enter into such an agreement. We need not resolve this interesting question, however, because the well-grounded findings of fact in this case make it clear that the funds of the claimant were not handled by respondent in the manner he posits to have been within the contemplation of the parties when the fund was established.

According to respondent, the $51,800 placed in escrow on 19 June 1989 was intended to secure later payment of the following fees and expenses:

| | | |
|---|---|---|
| 1. | Fees and expenses previously approved for payment by employer, but not yet paid because appeal pending | $ 12,500 [6] |
| 2. | Respondent's estimate of fee to be requested for additional appearance before ALJ | 11,800 |
| 3. | Respondent's estimate of fee to be requested for appearance before Benefits Review Board | 27,500 |
| | Total...................... | $51,800 |

---

6. On 11 February 1985 the ALJ had approved a fee of $6,820 plus expenses of $636.85, for a total of $7,456.85. On 16 May 1985 the Deputy Commissioner approved a fee of $5,000. Both fees were to be paid by the employer. Respondent rounded the total of $12,456.85 to $12,500.

At some point in time prior to April, 1990, respondent paid to himself $12,500 of fees and expenses, even though the employer had not yet paid that amount. This payment was inconsistent with the terms of the escrow agreement as related by respondent and as reflected by the language of the "receipt" prepared by respondent on 19 June 1989. This payment also resulted in respondent receiving payment of fees prior to the time contemplated by the Act, *i.e.*, prior to the time the approval of the fees became final.

With regard to the second sum represented in the escrow account, respondent did request the allowance of an additional fee of $11,800 from the ALJ. The ALJ approved a lesser fee of $9,775. On 31 July 1989, the employer paid this fee to respondent.[7] Respondent endorsed and delivered this check to the claimant, and withdrew $9,775 from the escrow account.[8] He did not refund the difference between the estimated fee and the approved fee to the claimant.

As noted above, the third component of the escrow account represented $27,500 that respondent said he intended to request as a fee for his services for the Benefits Review Board. In fact, respondent requested $17,875, and the fee approved by the Board was $9,750. This fee was not paid by the employer, but respondent withdrew this amount from the escrow account. Respondent did not pay to the claimant the balance of funds that had been in escrow to ensure payment of that fee.

In April, 1992, respondent withdrew an additional $8,000 from the escrow account. He did so, he testified, because his accountant told him he was required to pay income taxes on the entire amount of $51,800.[9] Respondent does not offer an

---

7. Respondent suggests the employer probably paid this fee in error, because its appeal was still pending.

8. A better accounting practice would have been for respondent to accept the check from the employer and pay $9,775 to the claimant from the fund. The effect of what was done, however, is the same.

9. Respondent's accountant did not testify.

explanation of why, even if he accepted his accountant's advice concerning his tax liability, he would have any right to take funds from the escrow account to pay his taxes.

## IV.

### *Rule 8.4*

■ Turning our attention to the exceptions relating to alleged violations of Rule 8.4 (misconduct), we hold that the evidence clearly shows a violation of this Rule. We agree with Judge Heller that respondent's handling of the claimant's money involved dishonesty within the meaning of § (c) of the Rule, and amounted to conduct prejudicial to the administration of justice as proscribed by § (d) of the Rule.

Without reaching the question of whether the establishment of an escrow fund would violate the Rules of Professional Conduct under any circumstances, it is clear that this fund was not administered in accordance with the restrictions that respondent now says were intended. Fees were taken from the fund before final approval of the award of compensation, and thus before they were due. Funds that should have been paid over immediately to the claimant when awards of fees were less than originally estimated were instead retained by respondent. Finally, respondent took $8,000 from the fund to pay his own taxes.

Respondent states that even though the original agreement of the parties was that the funds in escrow would secure the payment of fees earned as of 19 June 1989, respondent later became angry with the claimant because of an irresponsible life style, and decided to retain the excess funds as security for possible future fee awards for work done after the escrow was established. Respondent admitted in his testimony before Judge Heller that he made a mistake in retaining those funds, and in refusing to return them when demand was made by the claimant.[10]

---

10. The claimant requested return of excess escrow funds in 1991. Respondent did not return any funds until April, 1992, after claimant

 Whether respondent's conduct also amounted to "a criminal act" within the meaning of Rule 8.4(b) is a closer question. 33 U.S.C. § 928(e) provides in pertinent part:

> A person who receives a fee, gratuity, or other consideration on account of services rendered as a representative of a claimant, unless the consideration is approved by the deputy commissioner, administrative law judge, Board, or court ... shall, upon conviction thereof, for each offense be punished by a fine of not more than $1,000 or be imprisoned for not more than one year, or both.

Considering the obvious intent of this legislation, and the fact that a fee ordered to be paid by the employer is not payable until the award of compensation is final, we think it clear that the term "approved" as used in this subsection means "finally approved." Accordingly, respondent's act in taking fees in violation of this subsection amounted to "criminal conduct" within the meaning of the Rule. Respondent's exception to the finding that he violated Rule 8.4(c) and (d) is overruled. Petitioner's exception to the failure of the hearing judge to find a violation of Rule 8.4(b) is sustained.

### Rule 1.5(a)

 Bar Counsel also excepted to the hearing judge's failure to find a violation of Rule 1.5(a), which requires that "[a] lawyer's fee shall be reasonable." Judge Heller found that respondent's retention of part of claimant's compensation award contravened the provisions of the Act and of relevant federal regulations, but she believed those fees were not unreasonable because they were not excessive for the work actually done. The focus of Rule 1.5 is clearly upon excessive fees. Although a fee that is not permitted by law is by definition an unreasonable fee, we believe that where, as here, other Rules more specifically and completely address the

---

entered suit against respondent, and after the inquiry panel hearing had been held in this case. Respondent then paid the claimant $42,025, representing the original escrow of $51,800 less the $9,775 fee that had been paid by the employer, and thus properly taken from the fund.

improper conduct, adding a cumulative violation for the same conduct will serve no useful purpose. Under the particular circumstances of this case, we overrule Bar Counsel's exception to this finding.

*Rule 1.15(a)*

■ Rule 1.15(a) provides, in pertinent part, as follows:

A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Subtitle BU of the Maryland Rules.

Judge Heller found that respondent violated this Rule by not maintaining all of the $42,025 in his attorney trust account after April, 1990. Respondent excepts to this finding on two grounds. First, he argues, the Review Board did not specifically identify Rule 1.15(a) when it authorized Bar Counsel to file charges. Respondent cites *Attorney Griev. Comm'n v. Keister,* 327 Md. 56, 607 A.2d 909 (1992) and *Attorney Griev. Comm'n v. McBurney,* 282 Md. 116, 383 A.2d 58 (1978) in support of his argument. Those cases support the proposition that Bar Counsel is not authorized to file charges that are unrelated to facts found by the Review Board. That is not, however, the case here. The Review Board adopted the findings of the Inquiry Panel, which found that respondent had improperly taken fees from the escrow account. As this Court said in *McBurney, supra,* 282 Md. at 124, 383 A.2d 58:

It is the factual allegation against which the individual must defend himself. If Bar Counsel wishes to specify a violation of certain disciplinary rules in the petition to us, then certainly he should, as he did here, select all rules which conceivably might have application to the facts of the particular case, because he becomes limited in the disciplinary action by such rules as he selects.

*See also Attorney Griev. Comm'n v. Myers,* 333 Md. 440, 445, 635 A.2d 1315 (1994) (Bar Counsel is not required to "parrot

the Review Board. All that is required is that the charges filed reflect the factual allegation as to which authorization was given."); *Attorney Griev. Com'n v. Hamby*, 322 Md. 606, 611, 589 A.2d 53 (1991) (Bar Counsel's charges authorized where plainly related to the conduct found by Review Board).

Second, respondent argues, without elaboration, that Judge Heller erred in concluding that respondent violated Rule 1.15(a). The evidence is to the contrary, and plainly supports the finding. We note in passing, however, that under the circumstances of this case the finding of a violation of this Rule overlaps in large measure the finding of violations of Rule 8.4, and thus does not measurably add to the seriousness of the conduct for purposes of considering the appropriate sanction.

## *Rule 1.8(e)*

Petitioner charges respondent with violation of Rule 1.8(e) for allegedly improper loans made to the client while his claim was pending. Respondent does not dispute that he made personal loans to his client during his representation. He asserts, however, that the money advanced was unrelated to the claim, and therefore did not violate the rule.[11]

Judge Heller stated, "[t]he issue therefore, is whether personal loans by an attorney to a client, who is also a longstanding friend, are permitted ... when that attorney is representing his friend in a pending or contemplated case."

Rule 1.8(e) provides:

A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

---

11. At the hearing before the Inquiry Panel, claimant testified that in addition to lending money to respondent, he borrowed about $5,000 from him between 1985 and 1989.

(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

The Rule has not yet been construed by this Court, although its predecessor, Disciplinary Rule 5–103B of the Code of Professional Responsibility, has been.[12]

Decisions of this Court have construed DR 5–103B to prohibit an attorney from advancing money to a client while litigation is pending, whether or not the loans relate to the litigation, unless the funds are advanced for a purpose that falls into one of the exceptions enumerated in the rule. *Attorney Griev. Comm'n v. Kandel,* 317 Md. 274, 563 A.2d 387 (1989) (only costs directly associated with litigation may be advanced); *Attorney Griev. Comm'n v. Harris,* 310 Md. 197, 214–15, 528 A.2d 895 (1987), *cert. denied,* 484 U.S. 1062, 108 S.Ct. 1020, 98 L.Ed.2d 985 (1988) (personal loans unrelated to contemplated litigation violated DR 5–103(B)); *Attorney Griev. Comm'n v. Engerman,* 289 Md. 330, 339–40, 424 A.2d 362 (1981) (attorney violated DR 5–103 by advancing money for food and household expenses while litigation was pending).

■ Although there are differences between the former DR 5–103B and current Rule 1.8(e), we believe that the limitations on the purposes for which advances may be made remain essentially the same. Ethics opinions of other states inter-

---

**12.** The Maryland Rules of Professional Conduct became effective on 1 January 1987. Prior to that date, attorney conduct was governed by the Code of Professional Responsibility. Disciplinary Rule 5–103B of the Code of Professional Responsibility stated:

While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses.

preting Rule 1.8(e) support this view.[13] *See also* ABA Comm. on Professional Ethics and Grievances, Formal Op. 288 (1954) (advancing funds to client during pending litigation). Advancing non-litigation related expenses smacks of "purchasing an interest in the subject matter of the litigation" in which the lawyer is involved, and the majority view thus prohibits it. 2 *ABA/BNA Lawyers' Manual on Professional Conduct*, 51:803 (1991). Although we find that the funds advanced by respondent may have been made in part because of the long-standing personal relationship between respondent and his client, we nevertheless find that the loans here violated Rule 1.8(e). Respondent's exception to this finding is overruled.

## V.

### *Sanction*

We have found that respondent violated Rules 1.8(e), 1.15(a), and 8.4(b), (c), & (d). The most serious of these violations involves respondent's taking of $8,000 from the escrow account and using that money for payment of his personal taxes, and his taking of fees before he was entitled to them and in contravention of law. We have described similar transgressions as coming "perilously close to misappropriation of funds for which, in the absence of extenuating circumstances, disbarment is ordinarily the appropriate sanction." *Attorney Griev. Comm'n v. Owrutsky*, 322 Md. 334, 355, 587 A.2d 511 (1991).

The purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney, although concepts of general and specific deterrents are consistent with

---

13. *See ABA Lawyers Manual on Professional Conduct* §§ 901:4766; 901:2065 Michigan Informal Op. RI–14 (January 1, 1989) (prohibition is based on potential for compromised client loyalty and interference with settlement efforts, and prohibits lawyer employed by a legal aid agency from providing monetary assistance to client while litigation is pending); Connecticut Informal Op.90–3 (January 29, 1990) (lawyer handling personal injury case may not advance rent money to that client; Rule 1.8(e) contains exceptions for court costs and expenses of litigation, but not for humanitarian acts).

that primary goal. *Id.; Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 540–41, 565 A.2d 660 (1989).

 Respondent is 60 years of age and has been a practicing member of this Bar for 37 years. He has never previously received a disciplinary sanction. According to testimony given on his behalf, respondent is a respected practitioner, having acknowledged expertise in the worker's compensation field. His efforts in this case have resulted in significant financial benefit to the claimant, and, although the claimant was required to sue in order to secure the return of funds due him, the claimant is still friendly with respondent, and respondent continues to represent him in the worker's compensation case out of which this complaint arose.

Bar Counsel has recommended that respondent be suspended from the practice of law for a period of two years, and under all of the circumstances of this case, we agree. Accordingly, Myles R. Eisenstein shall stand suspended from the practice of law for a period of two years, and thereafter until all costs are paid. This sanction shall take effect 30 days from the date this opinion is filed.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS PURSUANT TO MARYLAND RULE BV 15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST MYLES R. EISENSTEIN.