507 A.2d 618

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**John Bacon WRIGHT.**

**Misc. (Subtitle BV) No. 14, Sept. Term, 1985.**

Court of Appeals of Maryland.

May 2, 1986.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Asst. Bar Counsel for the Atty. Grievance Com'n of Maryland, for petitioner.

Ronald A. Baradel, Annapolis, for respondent.

Argued before MURPHY, C.J., and SMITH, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

This attorney discipline proceeding concerns both the use of an hourly rate in billing for legal services and the ethical restraints on that method of billing.

The Attorney Grievance Commission (the Commission), through Bar Counsel, petitioned this Court for disciplinary action against John Bacon Wright (Wright), a member of the Maryland bar since June 28, 1949. The principal accusation was that Wright had violated Disciplinary Rule (DR) 2–106(A) by charging a clearly excessive fee for his work in closing two joint savings accounts and in paying therefrom the collateral inheritance taxes due by his clients. Pursuant to Maryland Rule BV 9(b), we submitted the matter to Judge Raymond G. Thieme, Jr. of the Circuit Court for Anne Arundel County for an evidentiary hearing. Judge Thieme found that the Commission failed to prove misconduct by clear and convincing evidence. Although our analysis differs from that of the trial judge, we shall dismiss the petition for the reasons given below.

Wright, in his capacity as counsel to the special administrator of a decedent's estate, had on September 1, 1983, gained access to, and inventoried the contents of, the decedent's safe deposit box at an Annapolis savings and loan association. Among the contents were passbooks for the two joint savings accounts at that institution which are involved here. On one account the owners by survivorship were Howard E. Armiger and Dorothy M. Bosley. The owners of the other account were Louise M. Deale and Charles E. Armiger. Wright took custody of the two passbooks and on September 2 wrote to the two sets of surviving joint tenants. He informed each set of what he then believed to be the balance in their respective accounts, $9,975.11 as to the Bosley-Howard Armiger account and $10,084.81 as to the Deale-Charles Armiger account. The letter advised that a ten percent inheritance tax was payable on one-third of the account balance. Each letter then concluded identically as follows:

We can arrange to have this account retitled in your two joint names, if you wish; or with your authority under a Limited Power of Attorney which we will prepare it can be closed out, the applicable tax and legal fees paid and separate $4,650.00 checks individually mailed to each of you.

None of the clients testified before Judge Thieme, but it is undisputed that each chose to have Wright handle the matter. When Wright deducted $300 as his legal fee from the remittance to each of the four clients, their reaction caused Wright to prepare and send a typewritten tabulation explaining to the clients his method of determining the fee charged.[1] It read:

Legal time to close joint savings accounts

| Date | Item | Time |
|---|---|---|
| 9–1–83 | Inspection of decedent's safe deposit box and inventorying her joint savings accounts | 1.4 |
| 9–2–83 | Letter to each joint savings account owner | 1.2 |
| 9–12–83 | Preparation and mailing Limited Power of Attorney to each joint savings account owner | 1.8 |
| 9–13–83 | Preparation and mailing Application to Fix Inheritance Tax for each joint savings account | 1.4 |
| 9–19–83 | Closing each account at Vermont Federal Savings and Loan Association (successor to Capital City Federal Savings & Loan Association) and receiving final checks to be deposited in special trustee account for disbursement | 3.2 |
| 9–23–83 | Letter to each joint account owner with final check | 1.0 |

---

**1.** At the hearing before Judge Thieme, Wright was not asked to, and did not on his own initiative, produce any time records of original entry.

Legal time to close joint savings accounts

| Date | Item | Time |
|------|------|------|
| Future time | Payment of applicable 10% Maryland inheritance tax on joint accounts to Orphans' Court for Anne Arundel County; answering questions from each account owner | 2.0 |
| | Total time | 12.0 hours |

Wright's position is that the foregoing tabulation is accurate and that he was entitled to bill at his usual rate of $100 per hour for all of this time.

DR 2–106(A) provides that "[a] lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." Factors which bear on the reasonableness of a fee are enumerated in DR 2–106(B) which reads:

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and the ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

At the evidentiary hearing, Bar Counsel produced three attorneys who opined that Wright's fee was clearly excessive, and Wright produced three attorneys who opined that the fee was reasonable. Judge Thieme made the following fact-findings:

### Inflated accounting of time spent on Complainants' behalf.

One of the factors to be weighed in determining whether a legal fee is clearly excessive is the time and labor required of the attorney to perform the tasks involved. Both the Petitioner's and Respondent's witnesses at the hearing conceded that the Respondent's hourly fee of $100 was reasonable. However, the testimony revealed the considerably contrasting opinions of the expert witnesses of the Petitioner and the Respondent regarding the reasonableness of the Respondent's accounting of the time he spent working for the Complainants. Disregarding for the moment the Petitioner's allegation that the labor expended by the Respondent was unnecessary (discussed below), the Petitioner and its witnesses contended that the Respondent's accounting of his time spent working on behalf of the Complainants was inflated. Specifically, they considered the time purportedly spent by the Respondent on preparing the Limited Powers of Attorney, preparing the Applications to Fix Inheritance Tax, and the closing of the joint accounts—1.8 hours, 1.4 hours, and 3.2 hours, respectively—inflated and excessive.

On the other hand, the Respondent's expert witnesses, each of whom certainly qualifies as "a lawyer of ordinary prudence" under DR 2–106(B), deemed the time spent by the Respondent on behalf of the Complainants to be reasonable. In reaching their conclusions, the Respondent's experts considered the adaptations that had to be made to each Limited Power of Attorney form, the time necessary to perform the limited arithmetic to compute

the respective inheritance taxes, and the delay at the Savings and Loan Association caused by the bank's personnel confirming the Respondent's authority to act.

The burden is on the Bar Counsel to prove misconduct by clear and convincing evidence. *Bar Association of Baltimore City v. Marshall*, 269 Md. 510, 516, 307 A.2d 677, 681 (1983); Maryland Rule BV 10(d). In view of the facts testified to at the hearing and the well-reasoned but conflicting opinions of the respective expert witnesses produced by the Petitioner and the Respondent, the Court cannot find that this burden has been met.

*Difficulty of and skill required to perform the legal services involved, and duty to inform Complainants that they do not require the services of an attorney.*

Other factors to consider in deciding whether a legal fee is clearly excessive include the difficulty of the services rendered and the degree of skill required to perform such services properly. Here again, the opinions of the parties' respective experts were polar opposites again regarding not only whether the Respondent employed the best procedure in closing the two joint accounts by utilizing Limited Powers of Attorney, but the witnesses also disagreed as to whether the Complainants even needed the assistance of legal counsel, and if not, whether the Respondent was obligated to so inform them.

The Petitioner urges the Complainants were totally without need for the Respondent's services, since the Complainants, with proper identification and proof of the decedent's passing, could have retitled the joint accounts or withdrawn funds therefrom on their own. The Petitioner's experts further testified that the computation of the applicable inheritance tax was sufficiently simple for the Complainants to have performed the arithmetic and paid the taxes themselves. Most significantly, the Petitioner alleged that, at a minimum, the Respondent should have informed the Complainants that his services were not required by them, and only then should the Respon-

dent have allowed the Complainants to decide whether they wished to retain him. As Abel Merrill, Esquire, one of the Petitioner's experts, testified:

"... But I think what's missing in our discussion here is the full knowledge of the client as to what's involved. A lawyer has superior knowledge as to what's necessary and what's not. And I think there would first have to be full disclosure to the client as to what's necessary and what's not ...

I read Mr. Wright's letter [of September 2, 1983] which didn't mention that the accounts could have been closed by each individual account owner ..."

The Respondent countered the Petitioner's allegations by contending that his use of the Limited Powers of Attorney was an acceptable method of proceeding. As William A. Franch, Esquire, testified on behalf of the Respondent:

"... Mr. Wright used a perfectly acceptable standard in his method of closing out the accounts. There are any number of ways in which this can be done ... any of which ... which have been referred to in the testimony here to today [sic] ... are perfectly acceptable."

In response to the Petitioner's contention that the Complainants did not need the services of an attorney, William Mitchell, Jr., Esquire, after being qualified as an expert, testified as follows:

"... [W]hen you have to pay the tax on one-third for the decedent, and you have two other people, you divide it into sixths. A lot of people don't understand that. And I think it does need a lawyer, or someone who knows about it to tell them. Mr. Wright had to do the calculations ..."

Mr. Mitchell further testified that it would have been unwise for the Respondent to advise the Complainants that they did not need the assistance of legal counsel:

"... Well, I don't think it's very safe advice ... I sat here and listened to that contention by the Petitioner

that the Complainants should have been told that they did not need an attorney and I wondered if the malpractice carriers would like you to advise clients that they can do things themselves. I will say there's a possibility that this can be done by you. But I'm not sure. I'm not going to tell you to do [sic] out and do it yourself . . ."

Although the Petitioner argued that the Respondent was under an affirmative obligation to inform the Complainants that they could have closed the joint accounts themselves, he could cite no support for this proposition; namely, that an attorney must advise his client of all possible methods of proceeding. Moreover, the Court is unaware of any such authority. Finally, the foregoing must be considered in view of the facts that one of the Complainants—Louise M. Deale—was an employee of a Savings and Loan Association and thus familiar with the requisites for closing a joint account; that Ms. Deale discussed this matter with her co-complainants, and that the Complainants nevertheless elected to retain the services of the Respondent.

In light of the conflicting perceptions of the undisputed facts by the Petitioner and the Respondent, and the equally conflicting opinions of the witnesses testifying at the hearing, all of whom the Court knows to be attorneys of impeccable reputation, the Court cannot conclude that the conduct of the Respondent was in violation of any Disciplinary Rule.

Whether Wright actually devoted to the various tasks involved the amount of time presented in his tabulation is a credibility issue which was for the trial judge to decide. We cannot say that Judge Thieme's findings of fact on that aspect of the case are clearly erroneous. For the same reason, we shall not disturb Judge Thieme's finding that an hourly rate of $100 for an attorney of Mr. Wright's experience is a reasonable rate for his services when legal knowledge and skill are required. But the fallacy in the analysis employed below lies in ending the inquiry with the product

of rate and time. DR 2–106(B) sets forth the principal factors to be considered as guides in determining the reasonableness of a fee. As quoted above, these include, in addition to time and labor, the novelty and difficulty of the questions involved, the skill required to perform the legal service properly, the results obtained, and the "likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer."

The result obtained for the clients in this case was to close two joint accounts at the same thrift institution, on behalf of two persons as to each account, and to pay the collateral inheritance tax of ten percent on the portion of each account which passed by operation of law to the surviving joint tenants. The thrift, Wright's office, the four surviving joint tenants, and the tax collector all have Annapolis addresses. The level of legal skill required for the services rendered by Wright was modest indeed. The services involved here are commonly performed by nonprofessionals—in small law offices by secretaries and in larger firms by paralegals—without detailed direction and under minimal supervision by way of review of the final product.

The degree of responsibility assumed by Wright, other than as a pure custodian, was also modest. Each account's balance was approximately $10,000. In round figures the total theoretical tax exposure of any one client was approximately $167, so that the fee charged each was almost twice the tax. As a practical matter there was no risk of an adverse result to any client because only a simple multiplication was involved. Even then an error in computing the tax liability reported could be cured without loss because the after tax funds, less fee, were disbursed to the clients and not to third parties.

■ The theory underlying the use of time records and hourly rates for the billing of legal services is that the resultant bill will be a reasonable one within the range established by the governing factors set forth in DR 2–

106(B). The Appellate Court of Illinois, in a recent case involving legal fees in a probate matter, described the use of hourly rates in the following fashion:

Under the alternative computation method, the fee awarded is premised upon the number of hours spent on the case and the attorney's hourly billing rate. These factors are viewed as reflecting the other considerations enumerated above [*i.e.*, the DR 2–106(B) factors]. Adjustments in the amount so determined may be made to reflect any special circumstances in the case, and the hourly rate may be varied for different attorneys and different activities.... Regardless of the method used for computation, however, the time expended is a very important factor in determining the amount of recovery, but the decision should not be based solely on the basis of a multiplication of the hourly rate by the time claimed to have been spent. [*Estate of Healy v. Tierney*, 137 Ill.App.3d 406, 409–410, 484 N.E.2d 890, 893 (1985).]

A frequently cited case which sets forth twelve factors to be considered in determining the reasonableness of legal fees is *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The first factor listed is the time and labor required, as to which the court said:

It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it. [*Id.* at 717.]

Although decided in the era of bar association fee schedules and suggested minimum fees, *In re Estate of Bacheller*, 437 S.W.2d 132, 140 (Mo.Ct.App.1968) illustrates a principle which remains valid today. That court said:

It appears from the testimony of Mr. Potter that much of the time for which he claimed compensation at $25.00 an hour, in fact represented the performance of clerical

functions which normally would have been performed by his secretary or the executrix and in acting as messenger boy in carrying checks to the bank, in wrapping and mailing items of jewelry, silver, etc., which were the subjects of the specific bequests in the will, and other routine and nonprofessional services. The attorney is not entitled to fees at professional legal rates for time spent in such menial endeavors.

And *see In re Estate of Larson,* 103 Wash.2d 517, 531, 694 P.2d 1051, 1059 (1985) ("Moreover, an attorney is not entitled to fees at professional legal rates for tasks that should be performed by staff, such as depositing checks in a bank.").

Measured *solely* by the level of legal knowledge, skill, and experience required and responsibility assumed to render the services involved here, a $1,200 fee among the four clients was clearly excessive.

■ In substance what occurred here is that the surviving owners of the two accounts employed Wright, essentially as a convenience, to do that which they could have done themselves. Under those circumstances Judge Thieme rested his analysis entirely on an approach which valued Wright's services by the rate which Wright can command for his time when rendering substantial legal service. An analogous concept is that the person who chooses to rent a Cadillac in order to get from point A to point B should pay the hire of a Cadillac even though that person could get from point A to point B in a compact car. In the relation of attorney and client, however, if a fee for work requiring only modest legal ability is to be based on the higher value of more complex legal work which the attorney is capable of performing, but which he is unable to perform because of the employment, then DR 2–106(B)(2) requires some kind of effective disclosure to the client as part of the terms of the

engagement.[2] One way for an attorney to disclose that, in effect, the fee will not be on a *quantum meruit* basis, is to have a special contract with the client.

Although there was no express, hourly rate contract in this case, there was a special contract. It is evidenced by the letters dated September 2, 1983, to the surviving joint tenants. As to the Bosley-Howard Armiger account, Wright's letter referred to a balance of $9,975.11. After deducting a tax of $332.50, computed according to the directions therein contained (10% of ⅓), the balance would be $9,642.61, so that each joint tenant's share was $4,821.31, or $171.31 more than the $4,650 which Wright stated in the letter he would disburse to each. That $171.31 per each of those two clients is the legal fee effectively quoted to them by Wright. Wright's letter to the owners of the Deale-Charles Armiger account stated the balance to be $10,-084.81. After deducting an inheritance tax of $336.16, the difference between each tenant's share and the promised distributions of $4,650 reflects a legal fee of $224.33 per surviving tenant on that account.

In actuality, Wright deducted $300 from the distribution to each tenant. On the Bosley-Howard Armiger account that is an increase of seventy-five percent over what he said he would charge, and on the Deale-Charles Armiger account that is an increase of thirty-three and one-third percent.

Wright's September 2 letters did not present the net distribution, and thereby the fee, simply as an estimated figure. Nor was a quoted fee in any way contingent on the after tax amount ultimately determined to be the balance in the respective account.[3] Where the attorney and client

---

**2.** Under the Maryland Model Rules of Professional Conduct, to be effective January 1, 1987, Rule 1.5(b) will provide that "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."

**3.** The disbursement checks drawn on Wright's escrow account and any letters covering transmittal of those checks are not in the record.

have a special fee arrangement they may, after disclosures appropriate to the existing confidential relationship, agree on a modification of that arrangement, but there was no modification here. Even if we interpret Wright's deduction of $300 from each tenant's share as a request by him for client approval of an increased fee, the complaints made by the clients manifest a refusal to agree. Thus, Wright violated the Disciplinary Rules by continuing to hold monies in excess of the fee which he told the clients he would charge and to which they agreed.

The difficulty is that the violation most probably is of DR 9–102(B)(4) which provides:

A lawyer shall

. . . .

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

The charges filed against Wright and the case as tried by Bar Counsel did not embody this theory. For that reason the petition must be dismissed. *See In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968).

PETITION DISMISSED. COSTS TO BE PAID BY ATTORNEY GRIEVANCE COMMISSION OF MARYLAND.

COLE, Judge, concurring.

The majority opinion is a sterling admonition to counsel to charge a fee commensurate with the legal services rendered. However, it is not a review of the case presented to,

---

It nevertheless appears from orphans' court records in evidence that inheritance tax was paid as to the Deale-Charles Armiger account on a principal balance of $10,648.28 and as to the Bosley-Howard Armiger account on a principal balance of $10,532.45. Wright's September 2, 1983, letters were written before accrued interest was determined. On these revised figures the net distribution to each client exceeds the $4,650 stated by Wright in his September 2 letters, even after deducting a $300 per client legal fee. Because the fee was not contingent, the increase in the net distribution actually made is immaterial.

argued before, and decided by Judge Thieme. The issue before Judge Thieme was whether the fees charged by the respondent under the circumstances described were clearly excessive and unreasonable. As proof of each side's position, three eminent and outstanding members of the Bar testified. Judge Thieme was unpersuaded by either side, and he thus concluded that Bar Counsel had not met his burden. The issue for us is simple: were Judge Thieme's conclusions clearly erroneous? We cannot say that they were, and for this reason, we should affirm the judgment. Hence, I concur.