733 A.2d 1029

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Jill Johnson PENNINGTON.

Misc. AG No. 13, Sept. Term, 1997.

Court of Appeals of Maryland.

July 28, 1999.

62

Melvin Hirshman, Bar Counsel, and Kendall R. Calhoun, Asst. Bar Counsel, for Atty. Grievance Com'n of Maryland.

N. Frank Wiggins, Washington, DC, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

BELL, Chief Judge.

## I.

The Attorney Grievance Commission of Maryland (the "Commission"), by Bar Counsel, acting pursuant to Maryland Rule 16–709, filed a Petition for Disciplinary Action against Jill Johnson Pennington (the "Respondent"), alleging that she did engage in misconduct. In the Petition, the respondent was charged with violating Rules 1.5,[1] 1.8[2] and 8.4,[3] of the

---

1. As relevant, that Rule, pertaining to fees, provides:
 "(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
 "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

"(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

"(3) the fee customarily charged in the locality for similar legal services;

"(4) the amount involved and the results obtained;

"(5) the time limitations imposed by the client or by the circumstances;

"(6) the nature and length of the professional relationship with the client;

"(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

"(8) whether the fee is fixed or contingent.
\* \* \*

"(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination."

2. Rule 1.8, "Conflict of Interest: Prohibited Transactions," provides, in pertinent part:

"(e) A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

"(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

"(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client."

The respondent was not charged with violation of Rule 8.1(j), which provides:

"(j) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

"(1) acquire a lien granted by law to secure the lawyer's fee or expenses; and

"(2) subject to Rule 1.5 contract with a client for a reasonable contingent fee in a civil case."

3. Rule 8.4 Misconduct

It is professional misconduct for a lawyer to:
\* \* \* \*

"(d) engage in conduct that is prejudicial to the administration of justice"

Maryland Rules of Professional Conduct. The Petition was referred, pursuant to Maryland Rule 16–711(a),[4] to the Hon. William B. Spellbring, of the Circuit Court for Prince George's County, for hearing and to make findings of fact and conclusions of law.

a.

Following a hearing, the filing of post-trial briefs, and reargument, the hearing court, as required, determined the facts, as follows:

"The respondent . . . is a lawyer, having graduated from the University of Minnesota Law School in June of 1981 and initially becoming a member of the bar of the District of Columbia before her admission to the bar of the Court of Appeals . . . on June 9, 1989.

* * * *

"Ms. Jeter felt that her employer [5]had discriminated against her for failing to move her from a sales position to a management position. On October 10, 1992, Ms. Jeter and Ms. Pennington executed a retainer agreement. . . .

"In that retainer agreement, Ms. Pennington became the attorney for Ms. Jeter for any and all employment discrimination claims by Ms. Jeter against Foot Locker. Prior to retaining Ms. Pennington, Ms. Jeter had consulted with another attorney but did not retain that attorney because of the retainer fee which the attorney requested and which Ms. Jeter was unable to pay.

"On October 16, 1992, Ms. Pennington wrote a check in the amount of $1,000. . . . That check was payable to Anita Jeter

---

**4.** Rule 16–711(a) reads:
"Rule 16–711. Disposition of Charges.
a. Findings. A written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

**5.** The hearing court determined that Ms. Jeter's employer was Kinney Shoes, trading as Foot Locker.

and was a loan to Ms. Jeter. The check was cashed by Ms. Jeter and the proceeds were used for her own personal use, other than for litigation expenses.

"In December of 1992, Ms. Pennington filed suit on behalf of Ms. Jeter against Foot Locker. On April 30, 1993, Ms. Pennington wrote a check in the amount of $350. . . .

"This April 30th check was also made payable to Anita Jeter and was a second loan. Ms. Jeter also cashed this $350 check and used the proceeds for her own personal use, other than litigation expenses. There was no agreement made at the time of either loan as to when or how those loans were to be repaid to Ms. Pennington by Ms. Jeter.

"Although Ms. Jeter sought compensation for the discrimination by her employer, her principal objective with that employer was to move from a sales position to a management position. In March of 1994, she was given a Kid Foot Locker store to manage. On June 15, 1994, while appearing before the magistrate judge in the United States District Court for Maryland, Ms. Pennington and counsel for Foot Locker reached an agreement to settle the lawsuit and that agreement was approved by and acceptable to Ms. Jeter.

"The settlement consisted of a payment of $25,000 by Foot Locker to resolve the lawsuit. A statement of settlement dated July 23, 1994, identifying the disbursement of the $25,000 was signed and received by Ms. Jeter. . . .

"Ms. Jeter received a check in the amount of $5318.83 as the proceeds due her from the settlement. Ms. Pennington received an attorney fee of $15,000 from the settlement, the remainder of the settlement proceeds paid expenses and the personal loans to Ms. Jeter from Ms. Pennington. Ms. Pennington recorded 144.4 hours consisting of consultation with her client, the drafting of pleadings, discovery proceedings and court proceedings in her representation of Ms. Jeter.

"Subsequent to the settlement disbursement Ms. Jeter returned to Ms. Pennington's office on her own initiative because she felt she owed more money to Ms. Pennington. Ms.

Pennington never inquired or never knew whether or not Ms. Jeter's household income equaled or exceeded $40,000.

"The retainer agreement executed between Ms. Pennington and Ms. Jeter on October 10, 1992, is a form document containing Ms. Pennington's handwriting in order to make the document specific to Ms. Jeter's claim. The document identifies Ms. Pennington's representation of Ms. Jeter in the following language: To represent and procure on behalf of the undersigned client any and all claims arising as a result of employment discrimination suffered by the client at Foot Locker and kid's Foot Locker from January 30, 1990, to the present.

"The document identifies Ms. Pennington's compensation as one-third of all sums recovered before suit is filed and 40 percent of all sums recovered if suit is filed and after suit is filed and also a payment of $5,000 at such time as the client's household income becomes not less than $40,000 per year. This $5,000 fee will be waived if the recovery is at least $60,000.

"The client is responsible for the identified expenses. No money is advanced towards those expenses, if Ms. Jeter discontinued the relationship with Ms. Pennington, the document states that Ms. Jeter will be responsible for Ms. Pennington's time billed at $100 an hour and for the time of law clerks, paralegals and or legal [assistants'] time billed at $50 an hour. This document was explained to Ms. Jeter by Ms. Pennington.

"Testifying as a character witness for Ms. Pennington was Mr. James H. Taylor, who is well-known and well-respected by this member of the court. Ms. Pennington had formerly been employed by Mr. Taylor. Mr. Taylor attested to Ms. Pennington's professional honesty and integrity."

b.

The hearing court concluded that the respondent violated Rules 1.5(a) and 1.8(e). It rejected the petitioner's arguments that she also violated Rules 1.5(c) and 8.4(d). With respect to

the Rule 1.5(a) violation, the hearing court found the "fee [to be] a combination fixed and contingent fee," that it was reasonable when agreed upon, because "both, the result and the means to the result [were] unknown," and that "the movement of the percentage of the attorney's compensation from one-third to two-fifths with the filing of a lawsuit" was appropriate. It determined, on the other hand, that the fee taken was not reasonable. The court explained:

"I base this finding, not only on the fact that the fee represents 60 percent of the settlement figure, but also on the fact that the respondent's hourly charge is in excess of the $100 per hour [charge] identified in the retainer agreement.

"The attorney's hourly rate is typed in at $200 per hour, but that figure is lined through and $100 is substituted in writing.

"The Court of Appeals in *Attorney Grievance Commission v. Korotki*, 318 Md. [646, 569 A.2d 1224] (1990) at Page [665] states, '[i]n seeking the increase, Korotki also crossed the fifty percent line and acquired a greater interest in the outcome of the litigation than his clients. Without passing on whether there can ever be circumstances justifying a contingent fee in excess of fifty percent it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake.'

"Nothing has been presented to this court which would justify that line being crossed in this case."

With respect to the Rule 1.8(e) violation, the hearing court reasoned:

"Based on the findings of fact that I have previously made, specifically, when the loans were made and when the attorney/client relationship began and based upon the authority of the *Attorney Grievance Commission of Maryland, versus Eisenstein*, 333 Md. 464, 625 [635] A.2d 1327 (1994), I find that the respondent has, in fact, violated rule 1.8(e)."

Only the respondent has taken exceptions to the hearing court's findings of fact and conclusions of law that she violated Rules 1.5(a) and 1.8(e), arguing that "[e]ach of those two findings was wrong and the charges should be dismissed." The exception to the Rule 1.5(a) violation is premised on the distinction between the *Korotki* case and the case *sub judice*, the former being entirely contingent and the latter, mixed, both contingent and fixed. She submits that the *Korotki* rule can never apply when the fee is mixed, pointing out that "[w]hen a fee arrangement diverges from the purely contingent to either a fixed or a mixed arrangement that has both a fixed and a contingent element, the parties can never know when they bargain for the fee whether the lawyer's share of proceeds will be more or less than 50 percent." She also notes that this case differs from *Korotki*, in that, she abided by the terms of the fee agreement. Finally, the respondent maintains that, judged by the applicable factors of Rule 1.5(a), the fee that the parties agreed upon was reasonable.

The respondent acknowledges that the hearing court applied, as it was required to do, this Court's holding in *Eisenstein* in finding the Rule 1.8(e) violation. Nevertheless, she asserts, that case was wrongly decided and thus merits our reconsideration and re-interpretation.

## II.

### a.

In *Korotki,* this court suspended a lawyer from the practice of law for eighteen months for charging an excessive fee. In so doing, we characterized the case as "a particularly aggravated case of greed overriding professionalism." *Attorney Grievance Com'n of Maryland v. Korotki,* 318 Md. 646, 649, 569 A.2d 1224, 1226 (1990). Korotki was charged with a violation of the predecessor of Rule 1.5(a), DR 2–106(B), and DR 5–103(A), which, while permitting an attorney to acquire a lien and to enter into a contingent fee arrangement, prohibited the attorney from acquiring a proprietary interest in the

litigation.[6] Initially, the fee agreement called for the clients "to pay unto said Attorney for his services the sum of 33–1/3% of all monies collected by way of settlement before suit is instituted, or 40% of all monies collected after suit is instituted, plus unreimbursed legal expenses." *Id.* at 653–54, 569 A.2d at 1228. While the case was pending in the Court of Special Appeals, both sides having noted appeals, Korotki called a meeting of the clients, at which, believing that they had no other choice, both signed documents titled "Appellate Fee Agreement," authorizing an additional 20 % fee. That agreement was signed after Korotki, without explaining his obligation to continue the representation absent an appellate fee agreement, told them: "that if they did not agree to the 20 percent increase the Respondent would no longer represent them .... that he would drop the case [and] that they would have to get another attorney who would charge them an additional 33⅓ to 40 percent if they could even get another attorney to handle the case. In any event, they would still owe the Respondent the original 40 percent." *Id.* at 655, 569 A.2d at 1229.

Subsequently, when the case was pending before this Court, the attorney once again held a meeting with the clients. At that meeting all but one of the clients signed a document headed "Appellate Fee Agreement—Court of Appeals." This agreement further increased Korotki's fee by another 15 percent of the recovery. *See id.* at 658, 569 A.2d at 1230. As to the client who did not sign the agreement, Korotki told him, in the presence of the others, that he was no longer represented and put him out of the office. He told the other clients: "that if they signed this agreement it would also obligate the Respondent to represent them in a new trial, if necessary, that

---

6. DR 5–103(A) states
"A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:
"(1) Acquire a lien granted by law to secure his fee or expenses.
"(2) Contract with a client for a reasonable contingent fee in a civil case."

he would negotiate their Workmen's Compensation liens, guarantee that they would get 20 percent of the amount recovered in a new trial, and not require them to pay costs and expenses if the case was lost." *Id.* at 659, 569 A.2d at 1230.

We concluded, as a threshold matter, that Korotki's initial undertaking extended not only to trial, but to appellate review as well. Support for that conclusion was found in the absence of anything in the agreement indicating a more limited undertaking. We also looked to the ordinary rule of construction of contingent fee contracts, which is "that, in the absence of an express provision which addresses possible appeal, services rendered by an attorney in upholding a judgment on appeal are within the undertaking under the contingent fee contract." *Id.* at 663, 569 A.2d at 1232. While we then acknowledged that a contingent fee that becomes quantified remains subject to the prohibition against clear excessiveness and to testing for reasonableness under the factors set out in the Rule, including the risk of the contingency, as well as under other relevant factors, *see id.* at 664, 569 A.2d at 1233 (citing R. Aronson, Attorney–Client Fee Arrangements: Regulation and Review 88–93 (Federal Judicial Center 1980) (Aronson); G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct*, at 82–83, 173 (1985)), we had no occasion to do so in that case, there being no argument that the initial fee was excessive.

It was the subsequent actions that Korotki took to increase his fee, contrary to that agreement, on which we focused and relied, and which informed our decision:

"In seeking the increase, Korotki also crossed the fifty percent line and acquired a greater interest in the outcome of the litigation than his clients. Without passing upon whether there can ever be circumstances justifying a contingent fee in excess of fifty percent, it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake. *See Aronson, supra,* at 92.

"In any event, C. Wolfram, *Modern Legal Ethics* § 9.3, at 521–22 (1986), discussing permissible fees, has pointed out that

'[i]n almost every case there will be a self-defined upper limit on a permissible fee charge—the amount to which the lawyer and client have agreed. Any charge by a lawyer in excess of that figure is plainly impermissible and thus excessive or unreasonable under the lawyer codes unless the parties have made a proper agreement to modify the amount.'

"Korotki sought to modify the fee agreements with his clients in the course of the confidential relationship of attorney and client. When attorney and client contract during that relationship "the law makes a presumption against the attorney and in favor of the client. In such case the *onus* is on the attorney to prove the entire *bona fides* and fairness of the transaction. . . ." *Merryman v. Euler,* 59 Md. 588–90 (1883). We have said that " '[t]o sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger.' " *Etzel v. Duncan,* 112 Md. 346, 350–51, 76 A. 493, 495 (1910) (quoting 4 Cyc. 960). And "the fact that the client agreed to the [amount of the fee] does not relieve the attorney from the burden of showing that the amount agreed upon was fair and reasonable." *Tucker v. Dudley,* 223 Md. 467, 473, 164 A.2d 891, 896 (1960). Consequently, if the attorney relies on a special fee agreement in defense of a disciplinary complaint that a clearly excessive fee has been charged, the attorney must demonstrate that the arrangement was made "after disclosures appropriate to the existing confidential relationship. . . ." *Attorney Grievance Comm'n v. Wright,* 306 Md. 93, 106, 507 A.2d 618, 624 (1986)."

*Id.* at 665–66, 569 A.2d at 1234 (some citations and footnotes omitted).

The facts of this case are dissimilar from the facts in *Korotki.* The fee agreement in this case was never changed, nor attempted to be changed by the respondent; the fee agreement, pursuant to which the respondent was paid for her representation, was the same one that the parties made when Ms. Jeter retained the respondent. The fee agreement called for the respondent to receive 40 percent of the sums recovered if suit was filed, and after suit was filed, if the recovery was less than $60,000, a $5000 payment when Ms. Jeter's household income became not less than $40,000.

Moreover, the undertaking on which the respondent embarked had a different and broader focus, as the hearing court found, a finding supported by the record, because Ms. Jeter's principal objective was to move from a sales position to a managerial one. Consequently, from Ms. Jeter's perspective, the respondent's success would be determined more by that outcome than by the amount of the monetary recovery, taken alone or in isolation. This probably accounts for the fact that the agreement in this case, unlike that in *Korotki,* was neither fully contingent nor fully fixed. That certainly was relevant to the respondent's willingness to accept Ms. Jeter's case, as the hearing court recognized.

The petitioner argued that any fee agreement that authorizes a fee for an attorney in excess of 60% of the recovery is per se unreasonable. Certainly, the argument is not confined to contingent fee cases and, given the context of this case, applies, and is intended to apply, to all cases. It is not clear whether that argument was rejected. To be sure, the hearing court indicated that it was relying on the fact that the retainer agreement reflected an hourly rate to be charged of $100 [7] and

---

7. This is not a fact as to which all parties agree. The respondent relies on her testimony, calling it the best evidence and contending that that part of the retainer agreement was difficult to read, in arguing that the fee the parties agreed the client would pay in the event of a default by the client was $150. The hearing court apparently had no difficulty

the actual hourly rate represented by a 60% fee was more than $100 an hour; however, it also found the fee unreasonable in this case, in part, at least, because the respondent's fee was 60% of the recovery. And this was after it had made findings of fact in connection with the applicable factors that seemed to favor the respondent.[8]

We agree with the hearing court, the retainer agreement, with its contingent elements unknown at that time, was reasonable when the parties entered into it. *Korotki* teaches, however, as the hearing court recognized, that an agreement, reasonable when made, may become unreasonable in light of changed facts and circumstances. 318 Md. at 664–65, 569 A.2d at 1233( citing and quoting *Matter of Swartz*, 141 Ariz. 266, 273, 686 P.2d 1236, 1243 (1984)). Thus, as *Korotki* points out, and, again, as the court understood, the question of the reasonableness of a contingent fee agreement, or one with contingent features, must be revisited after the fee is quantified or quantifiable and tested by the factors enumerated in Rule 1.5(a). *Id.* at 664, 569 A.2d at 1233.

Not every contingent fee agreement or mixed fixed and contingent fee agreement has as its object the maximization of financial or monetary return. As we have seen, in this

---

reading that portion of the agreement and the hearing court is, after all, the trier of facts.

8. The hearing court said, in that regard:

"Considering the factors identified in rule 1.5, the evidence before the court is that respondent worked 144.4 hours on this matter. Although there is no evidence before the court as to the novelty or the difficulty as to the issues contained within Ms. Jeter's case, it is this member's of the court experience that these cases are fact driven. "No evidence was presented regarding factors 2, 3 and 5. The result obtained was a $25,000 settlement. This was the first professional relationship between this attorney and this client. And I accept Mr. Taylor's opinion that the respondent is very [competent] as an attorney."

the court later acknowledged that it accepted the respondent's reasoning for including a fixed fee element in the retainer, although it interpreted that reasoning as being a hedge against the client accepting, consistent with the client's "principal objective," a settlement without any monetary component.

case, the client's primary objective was to obtain a managerial position. When that is the case and such an objective is achieved, along with a monetary recovery, the reasonableness of the attorney's compensation cannot be determined simply by reference to the amount of the monetary settlement or recovery; the value of the achievement of the objective must be taken into account as well. In this case, the result was the recovery of $25,000 and successful placement of Ms. Jeter in a managerial position. Certainly, the value of the case is greater than $25,000, which constitutes only a part of the recovery. It is also the value to Ms. Jeter of having the managerial position. Rule 1.5(a)(4) recognizes this analysis, referring both to the amount at issue and the result achieved. Consequently, we reject, under these circumstances, the per se argument urged by the petitioner. Adoption of such a rule would lead not simply to absurd results, but to some unintended ones as well.

So viewed, when the 1.5(a) factors are applied, it is obvious that, under these circumstances, the respondent's fee was reasonable, or at least not so excessive as to violate the rule. Of the eight factors enumerated in the Rule, the hearing court had information pertaining to five and, so, five of the factors had to be analyzed. The respondent spent more than 144 hours pursuing the case, time which the court found was justified, given the fact-intensive nature of the case, in which the respondent was engaged. Favorable results were obtained for the client, Ms. Jeter not only recovered monetary damages of $25,000, but she realized her major objective, moving from sales to a managerial position. There had been no other professional relationship between the respondent and Ms. Jeter and, so far as the record reveals, no prior social one either. The hearing court accepted the testimony of the respondent's former employer, who, commenting on her professional reputation, characterized the respondent as honest and a person of integrity. He also testified that she was "very competent." And, as we have seen, the fee was a combination contingent and fixed fee.

b.

Each of the factors relevant to this case, as to which there is information, favors the respondent. The hearing court so found and those findings are supported by the record. Rather than considering both of the factors addressed in Rule 1.5(a)(4), the hearing court focused only on the monetary recovery. That limited significantly the value of the case by factoring out that which was the most important consideration to the client. The court then applied the per se rule that a fee agreement that results in a fee of more than fifty percent to the attorney is excessive. In so doing, the court erred. The respondent's exception as to this finding and conclusion is sustained.

The problem the respondent has with the finding of a Rule 1.8(e) violation is with neither the court's finding of fact nor its conclusion of law. Rather, she contends that the *Eisenstein* case, on which the court relied, was wrongly decided by this Court. Specifically, she takes issue with our interpreting that Rule identically to its predecessor, DR 5–103B, despite the fact that the wording has admittedly been changed. DR 5–103B, as relevant provides:

"While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client. . . ."

Rule 1.8(e) now states:

"A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation. . . ."

The respondent finds this change in language to be inexplicable except by reference to the conduct that the rules were intended to proscribe. Noting that the vice the rule is intended to address and curb is "stirring up litigation," citing Hazard & Hodes, 1 *The Law of Lawyering*, 273 (1996 supp.), and arguing that the present rule focuses on conduct resulting in financial assistance being given "in connection with pending or contemplated litigation," she asserts that:

"There is absolutely no demonstration here that the loans made by Ms. Pennington to Ms. Jeter made litigation more

likely; the loans did not stir up litigation. The only action by Ms. Pennington that made the assertion of Ms. Jeter's ultimately successful employment discrimination claims more likely (the only action by Ms Pennington that stirred up litigation) was her willingness to undertake the representation of Ms. Jeter on a contingent fee basis."

 Essentially the same argument made in this case was made by Eisenstein. We rejected the argument then. There is no reason to accept it now. We continue to be of the belief that the prohibition intended by the present rule is essentially the same as the reach of the prior rule. The exception is overruled.

### c.

The remaining issue to be resolved is the appropriate sanction to be imposed for the Rule 1.8(e) violation. The petitioner recommends a suspension from the practice of law for a period of six months and that respondent make restitution to Ms. Jeter in the amount of $5,000. That recommendation is premised on both rule violations being upheld. The respondent asks that a sanction no more severe than a reprimand be imposed, if the Court does not accept her invitation to dismiss the Rule 1.8(e) charge. As she sees it, that is consistent with the petitioner's recommendation if only that violation is sustained: "The brief argument that follows [the petitioner's] recommendation is right in its tacit concession that, even if the Court finds a violation of Rule 1.8(e), no punishment more severe than a reprimand (or censure, as the penalty is labeled in some jurisdictions) is warranted."

 It is well-settled, and we have said it often, "[t]he purpose of disciplinary proceedings against an attorney is to protect the public rather than to punish the erring attorney." *Attorney Grievance Com'n v. Hamby*, 322 Md. 606, 611, 589 A.2d 53, 56 (1991). "The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed."*Attorney Grievance Comm. v. Awuah*, 346 Md.

420, 435, 697 A.2d 446, 454 (1997). The facts and circumstances of the case before the Court determines the sanction to be imposed. *Attorney Grievance Com'n v. Ober*, 350 Md. 616, 631–32, 714 A.2d 856, 864 (1998); *Hamby*, 322 Md. at 611, 589 A.2d at 56. We have also made clear that the nature and extent of the discipline imposed is dependent on the severity of the attorney's misconduct and the particular facts of the case. *Attorney Grievance Com'n of Maryland v. Milliken*, 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998); *Attorney Grievance Comm'n v. Montgomery*, 318 Md. 154, 165, 567 A.2d 112, 117 (1989).

In *Ober*, the respondent, who had been practicing law for more than 20 years without having previously been sanctioned by the Court, had violated disciplinary rules by entering into inappropriate financial transactions with a client, borrowing client funds, failing to maintain adequate trust account records, losing a client's file, and demonstrating a lack of diligence in handling a client's case. *See Ober*, 350 Md. at 632, 714 A.2d at 864. Careful to point out that the respondent had not intended to defraud anyone, we concluded that the appropriate sanction was a thirty day suspension. *See id.*

 The only violation sustained in this case is that involving inappropriate financial transactions with a client. As was the case in *Ober*, the respondent here has no previous involvement with the disciplinary body. Under the circumstances, we think that the respondent is correct, the appropriate sanction is a reprimand.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16-715, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JILL JOHNSON PENNINGTON.*